

3 Park Plaza, Suite 100
Irvine, California 92614
soderstromlawfirm.com

949.667.4700 (phone)
949.424.8091 (facsimile)
jamin@soderstromlawfirm.com

---

April 10, 2018

**<u>VIA CM/ECF FILING</u>**

Honorable Alison J. Nathan
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York

***Beals v. Audible, Inc.*; 17-cv-09838 (AJN)**

Re:     Notice of Corrective Action in the Related *McKee v. Audible* Case

Dear Judge Nathan:

On April 6, 2018, Judge George H. Wu in the Central District of California granted in part a motion for corrective action directed at Audible, Inc.'s revisions to its sign-up and credit redemption webpages and underlying arbitration clause. Plaintiff Seth Beals' "gift membership" and "gift credit" claims against Audible are similar to the "regular membership" and "regular credit" claims pending against Audible in the Central District of California, and Beals filed a similar motion for corrective action based on Audible's revisions to its Gift Terms (*see* Docket No. 81).

Beals hereby respectfully gives the Court notice of Judge Wu's ruling and attaches a copy of the ruling as **<u>Exhibit 1</u>**.

Very truly yours,

SODERSTROM LAW PC

Jamin S. Soderstrom
CA Bar No. 261054 (admitted Pro Hac Vice)
jamin@soderstromlawfirm.com

*Counsel for Plaintiff and the Proposed Class*

---

Business Law     |     Employment Law     |     Consumer Law     |     Intellectual Property

# EXHIBIT 1

Exhibit 1 Page 2

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 17-1941-GW(Ex) | Date | April 6, 2018 |
|---|---|---|---|
| Title | *Grant McKee v. Audible, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** **IN CHAMBERS - RULING ON PLAINTIFFS' MOTION FOR CORRECTIVE ACTION [72]; and AUDIBLE'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS AS TO PLAINTIFFS ERIC WEBER AND MICHAEL ROGAWSKI [73]**

Attached hereto is the Court's Ruling on the above-entitled Motions. The Court would GRANT-in-part and DENY-in-part Plaintiffs' Motion for Corrective Action. The Court would GRANT Audible's Motion to Compel Arbitration as to Plaintiff Ragowski (subject to the evidentiary issues) but DENY Audible's MTC as to Plaintiff Weber.

The Court sets a status conference for April 19, 2018 at 8:30 a.m., with a joint report re proposed dates to be filed by April 16, 2018.

Exhibit 1 Page 3

| | : | |
|---|---|---|
| | Initials of Preparer | JG |

***McKee v. Audible, Inc. et al.***, Case No. CV-17-1941-GW (Ex)
Final Rulings on: (1) Plaintiffs' Motion for Corrective Action, and (2) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski

## I. Background

Plaintiffs Grant McKee ("McKee"), Eric Weber ("Weber"), Michael Rogawski ("Rogawski" and together with McKee and Weber "the California Plaintiffs"); Taylor Fisse ("Fisse"); and Bryan Rees ("Rees") (collectively, "Plaintiffs") sue Defendant Audible, Inc. ("Audible") on behalf of a proposed nationwide class of consumers for: (1) violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (2) Common Law Fraud and Misrepresentation; (3) violation of Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD") and Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693*l*-1(a)(2)(B); (4) violation of the California Gift Certificate Law ("GCL"), Cal. Civ. Code §§ 1749.45 *et seq.*; (5) Violation of EFTA, 15 U.S.C. § 1693; (6) Common Law Conversion; (7) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* and Violation of California's Automatic Purchase Renewals Law, Cal. Bus. & Prof. Code § 17600 *et seq.*; (9) Violation of North Carolina's Unfair Competition Law; and (10) Restitution, Unjust Enrichment, and Money Had and Received.[1]  *See generally* Second Amended Class Action Complaint ("SAC"), Docket No. 65.

## II. Procedural Background

Plaintiff McKee originally sued both Audible and Amazon.  *See* Docket No. 1.  Both Defendants moved to compel him into arbitration.  *See* Docket No. 18.  The Court granted-in-part and denied-in-part the Defendants' motions to compel.  *See* Final Ruling on Defendants' Motion to Compel Arbitration and Dismiss Claims ("Ruling I"), Docket No. 37.  The Court granted Amazon's motion to compel because it found that McKee had entered into a binding, click-wrap agreement to arbitrate his claims against Amazon.  *See* Ruling I at 17-18 (concluding that Amazon's checkout page provided McKee with sufficient notice of Amazon's "conditions of

---

[1] Plaintiff Seth Beals' claims were dismissed and/or transferred to New York per the Court's granting of Defendant's Motion to Compel Arbitration as to him.  *See* Docket No. 61 (finalizing the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53).

Exhibit 1 Page 4

use" ("COU") and the arbitration provision contained therein). The Court denied Audible's motion to compel because it found that McKee never agreed to arbitrate claims against Audible. *Id.* at 11-17. The Court found that Audible's mobile online sign up process and Audible's mobile Credit Redemption Flow did not afford McKee sufficient notice of Audible's COU and, for that reason, McKee never agreed to the Audible COU. *See id.* 11-14. The Court also found that McKee's agreement to *Amazon's* COU and his subsequent activation of his Amazon Echo did not bind him to *Audible's* COU. *Id.* at 15-17.

Plaintiff filed a First Amended Complaint ("FAC") on August 11, 2017, adding Seth Beals as a second named Plaintiff. *See* Docket No. 40. Audible successfully moved to compel many of Beals' claims to arbitration because the process by which Beals signed up for Audible was different from McKee such that it provided Beals with notice of the Audible COU containing the arbitration provision. *See Final Ruling on Audible's Motion to Compel Arbitration and Dismiss Claims as to Seth Beals*, Docket No. 61 (adopting the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53, as its final decision). The Court also transferred the rest of Beals' claims to New York pursuant to a venue selection clause contained in Audible's Gift Membership Terms. *See* Docket No. 64.[2]

Audible also moved to dismiss McKee's claims as alleged in the FAC. *See* Docket No. 42. The Court granted in part and denied in part that motion. *See* Ruling II at 38. The Court granted the motion with respect to McKee's Lanham Act claim with prejudice. *Id.* The Court also granted the MTD with respect to McKee's claims for violation of California's Automatic Purchase Renewals Law ("CAPRL"), Conversion, and Restitution without prejudice. *Id.*[3] McKee was given leave to amend and filed the now operative SAC on December 15, 2017. Plaintiffs Rogawski, Weber, Fisse, and Rees joined the suit at that time.[4] Since the filing of the SAC, Audible has filed three motions: (1) Audible's Partial Motion to Dismiss the SAC as to

---

[2] The Court transferred Beals' claims after granting Audible's Motion to Change Venue. *See* Docket No. 62.

[3] The Court found that McKee lacked standing to assert his CAPRL claim based on Audible's alleged charging of non-designated credit cards because Audible never charged a non-designated credit card of McKee. *See id.* at 28. The Court also found that, even if McKee had standing to assert such a claim, the FAC's allegations were insufficient for the purposes of Rule 12(b)(6) because Plaintiff did not allege the specific disclosures Audible made at the point of sale in connection with its policy of automatic charges. *Id.* at 36-37. The Court also dismissed Plaintiff's CLRA claim (based on unconscionable terms), his UCL claim (also based on unconscionable contract terms), and his claim for Restitution, Unjust Enrichment, and Money Had and Received. *Id.* at 37-38.

[4] Weber has also sued Amazon in a related case also before this Court.

Exhibit 1 Page 5

Plaintiff McKee ("MTD SAC"), Docket No. 71; (2) Audible's Motion to Dismiss the SAC as to Fisse and Rees for Lack of Personal Jurisdiction ("MTD Fisse & Rees"), Docket No. 70; and (3) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski ("MTC"), Docket No. 73. Plaintiffs have filed a Motion For Corrective Action ("Pl. Mot.") under Fed. R. Civ. Proc. 23(d). *See* Docket No. 72.

On March 12, 2018, the Court issued a tentative ruling ("TR") on Audible's Motion to Dismiss the SAC and Motion to Dismiss as to Fisse & Rees. *See* Minutes of Hearing on Audible's MTD SAC, MTD Fisse & Rees, MTC, and Pl. Mot. ("Ruling III"), Docket No. 87. Consistent with the TR, the Court would grant Audible's MTD SAC with respect to Counts V and X but deny the MTD SAC with respect to Counts VII and VIII. *See* Ruling III at 31-32. The Court would also grant Audible's MTD Fisse & Rees for the reasons stated in the TR, with one modification. *See id.* at 20. The Court has the power to transfer Fisse's and Rees's claims to another district in which the claims could have been filed to cure a want of personal jurisdiction. *See* 28 U.S.C. § 1631. The parties have informed the Court that they stipulate to the transfer of Fisse's and Rees's claims to the Eastern District of North Carolina to avoid the inefficiency of dismissal and re-filing, subject to Defendant's reservation of the right to raise any jurisdictional or venue defenses that may exist. Accordingly, the Court would transfer Fisse's and Rees's claims to the Eastern District of North Carolina and instructs Audible's counsel to prepare an order effecting such transfer. All of Defendant's jurisdictional and venue defenses are preserved.

The Court deferred consideration of Audible's MTC to allow Plaintiff to file a Sur-Reply responding to new evidence Audible submitted in its Reply brief, and allow the parties to try to work out evidentiary disputes regarding the content of the Audible web site and mobile application on relevant dates.[5] Plaintiff filed his Sur-Reply on March 22, 2018. *See* Sur-Reply in Opposition to MTC ("Sur-Reply"), Docket No. 90. The Court also deferred consideration of Plaintiffs' Motion for Corrective Action because its merits might be informed by Weber and Rogawski's alleged interactions with Audible's web site. *See* Ruling III at 8 n.8, and at 32.

These two motions are now pending before the Court and have been fully briefed. *See* MTC; Pl.'s Mot.; *see also* Plaintiff's Opposition to Audible's Motion to Compel Arbitration as to

---

[5] Audible's moving papers had erroneously relied on evidence about the "wrong" Eric Weber. *See* Ruling III at 32; *see also* Transcript for Proceedings Held on 3/12/18 ("Tr.") at pages 19 through 21. The Court also directed the parties to meet and confer with respect to the appearance of the Audible's mobile and web pages on certain relevant dates hopes that the parties could stipulate to the content of the relevant sites on the dates that Audible contends that Weber and Rogawski interfaced with the site. *See id.*; *see also* Tr. at 19-21.

Exhibit 1 Page 6

Plaintiffs' Weber and Rogawski (Pl.'s Opp'n"), Docket No. 77; Memorandum in Opposition to Plaintiffs' Motion for Corrective Action ("Def.'s Opp'n"); Reply in Support of Motion to Compel Arbitration as to Weber and Rogawski ("Def.'s Reply"), Docket No. 82; Reply in Support of Motion for Corrective Action ("Pl.'s Reply"), Docket No. 80.

### III. Plaintiff's Motion For Corrective Action

#### A. Background

Plaintiffs seek corrective action under Fed. R. Civ. Proc. 23(d) on the basis that Audible has made changes to its Sign Up and Credit Redemption Flows following this Court's denial of Audible's Motion to Compel Arbitration as to Grant McKee.  *See* Pl.'s Mot. at 1.

Audible changed the Sign Up Flow on its mobile webpage shortly after this Court ruled that the previous version failed to provide notice of the arbitration agreement contained in Audible's COU.  Declaration of Jamin Soderstrom in Support of Motion for Corrective Action ("Soderstrom Decl.") Ex. 5 (Revised Sign Up Flow), Docket No. 72-7; Docket No. 21-4 (Original Mobile Sign Up Flow).  The changes effectively fixed the issues that plagued the Original Sign Up Flow.  *See* Pl.'s Mot. at 4 (side by side comparison of the two sign up flows).  Audible also changed its Mobile Credit Redemption Flow and Standard Credit Redemption Webpage.  *See* Docket No. 44-4 (Original Credit Redemption Flow); Soderstrom Decl. Ex. 7, Docket No. 72-9 (Revised Credit Redemption Flow); *see also* Pl.'s Mot. at 5 (side by side comparison).  Audible also made changes to its mobile and standard credit redemption pages on Amazon.com.  *See* Docket No. 21-16 (Original Amazon Mobile Flow); Soderstrom Decl. Ex. 8 (Revised Amazon Mobile Flow), Docket No. 72-10; Docket No. 44-3 (Original Amazon Standard Credit Flow); Soderstrom Decl. Ex. 9 (Revised Amazon Standard Credit Flow), Docket 72-11.  Audible also made changes to its COU, its Gift Membership Terms, and its policies relating to "gifting" Credits.  *See* Soderstrom Decl. ¶¶ 1-4.

Audible does not appear to have notified its current users of the pending litigation when it made these changes, or otherwise indicate that these changes would have the legal effect of requiring-for the first time-that each member agree to arbitrate their claims in exchange for continued use of Audible's service.  Additionally, Audible does not appear to have allowed its current customers to opt out of the arbitration agreement, or to offer to refund amassed Credits or membership payments in the event a member did not want to enter into an arbitration agreement in exchange for continued use of Audible.

Exhibit 1 Page 7

Plaintiffs contend that such efforts constitute improper communications with putative class members that potentially interfere with putative members' ability to join the class. As such, Plaintiffs ask for certain corrective action, most notable the invalidation of any arbitration agreement procured through changes on Audible platforms following the initiation of this action.[6]

### B. Legal Standard

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "Rule 23(d) gives district courts the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation." *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S. Ct. 74, 181 L. Ed. 2d 1 (2011). "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." *O'Connor v. Uber Technologies, Inc. ("Uber II")*, No. C-13-3826 EMC, 2014 WL 1760314, at *3 (N.D. Cal. May 1, 2014).

*Gulf Oil* mandates that "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at 101. "[S]uch a weighing − identifying the potential abuses being addressed − should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102. An order under *Gulf Oil* "does not require a finding

---

[6] Plaintiffs ask the Court to order that:

> any arbitration agreements that Defendant secures based using webpages, disclosures, and/or terms that Defendant revised after this action was filed are invalid and unenforceable insofar as they are or could be used to limit consumers' potential participation in this action or ability to file or participate in another action. This order has no effect on any arbitration agreements that Defendant may have secured using webpages, disclosures, and/or terms that existed when this action was filed.

Proposed Order Granting Plaintiffs' Motion for Corrective Action, Docket No. 72-15.

5

Exhibit 1 Page 8

of actual misconduct" − rather, "[t]he key is whether there is 'potential interference' with the rights of the parties in a class action." *O'Connor v. Uber Technologies, Inc.* (*"Uber I"*), No. C-13-3826 EMC, 2013 WL 6407583 at *4-5 (N.D. Cal. Dec. 6, 2013) (quoting *Gulf Oil*, 452 U.S. at 101).

Rule 23(d) does not prohibit offers of settlement to putative class members, *see Gulf Oil*, 452 U.S. at 95, but courts may limit communications that improperly encourage potential class members to not join the suit, especially if the defendant fails to provide adequate information about the pending class action. *See Uber II*, 2014 WL 1760314 at *6-7. The best notice will "contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member." *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1104 (5th Cir. 1977).

Courts in the Ninth Circuit have limited communications, as well as invalidated agreements that resulted from those communications, when they omitted critical information or were otherwise misleading or coercive. *See, e.g.*, *County of Santa Clara v. Astra USA, Inc.*, No. 05-3740 WHA, 2010 WL 2724512 (N.D. Cal. July 8, 2010) (invalidating releases obtained by letter to putative class that did not attach plaintiffs' complaint, explain plaintiffs' claims or the status of the case, or include contact information for plaintiffs' counsel); *Camp v. Alexander*, 300 F.R.D. 617, 620, 624 (N.D. Cal. 2014) (invalidating opt-outs obtained by letter to employees of defendants stating the class action was "motivated by greed and other improper factors" and "could result in the closure" of the business, and failed to include any explanation of plaintiffs' claims, a copy of the complaint, or contact information for plaintiffs' counsel); *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-out forms when defendant employer presented the forms in mandatory one-on-one meetings during work hours, failed to provide forms in workers' primary language, and refused to give workers copies to take home); *Wright v. Adventures Rolling Cross Country, Inc.*, No. 12-0982 EMC, 2012 WL 2239797 at *5 (N.D. Cal. June 15, 2012) (enjoining defendants from communicating with potential class members after they e-mailed members warning that if they participate in the suit, their "past transgressions will become very public" and they will be "left with tattered reputations and substantial legal bills").

Courts have also exercised their discretionary power under Fed. R. Civ. Proc. 23(d) to invalidate or refuse to enforce arbitration agreements implemented while a putative class action

Exhibit 1 Page 9

is pending if the agreement might interfere with members' rights.  *See, e.g.*, *Uber I*, 2013 WL 6407583, at *7 (invalidating arbitration agreement imposed before class certification where imposing agreement risked interference with putative class members' rights); *Balasanyan v. Nordstrom, Inc.*, No. 11-CV-2609-JM-WMC, 2012 WL 760566, *1-2, 4 (S.D. Cal. Mar. 8, 2012) (declining to enforce individual arbitration agreement in class action where defendant's implementation of arbitration agreement was an improper class communication); *Williams v. Securitas Sec. Servs. USA, Inc.*, No. 10-7181, 2011 WL 2713818, *1 (E.D. Pa. July 13, 2011) (refusing to enforce arbitration agreement imposed during pendency of putative class action); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252-54 (S.D.N.Y. 2005) (refusing to enforce arbitration agreement instituted after putative class action was filed as it might mislead class members).

This authority under Rule 23(d) to enjoin or control communications exists even prior to class certification.  *See, e.g.*, *Urtubia v. B.A. Victory Corp.*, 857 F.Supp.2d 476, 484 (S.D.N.Y. 2012) ("A court possesses such supervisory authority even before a class is certified."); *accord Friedman v. Intervet Inc.*, 730 F.Supp.2d 758, 765 (N.D. Ohio 2010) (listing cases); *Sorrentino v. ASN Roosevelt Ctr. LLC*, 584 F.Supp.2d 529, 532 (E.D.N.Y. 2008).

### C.  Application

The key question before the Court is whether Audible's changes to its various Sign Up and Credit Redemption Flows ("the Flows") constitute communications that interfered, or have the potential to interfere with putative class members' ability to participate in the lawsuit.  *See Gulf Oil*, 452 U.S. at 101; *Wang*, 632 F.3d at 756.  Plaintiff need not demonstrate "actual misconduct" − rather, "[t]he key is whether there is 'potential interference' with the rights of the parties in a class action." *Uber I*, 2013 WL 6407583 at *4-5 (quoting *Gulf Oil*, 452 U.S. at 101).

The Court would find that Audible's changes to its online flows constitute misleading and/or coercive communications to putative class members that potentially interfere with the rights of putative class members and, as such warrant narrowly tailored corrective measures. *Gulf Oil*, 452 U.S. at 101.  The Court bases its decision on the following findings and evidence.

First, the changes Audible made to the Flows took place during the pendency of this class action, and after the Court denied Audible's initial motion to compel arbitration.  *See Jimenez v. Menzies Aviation Inc.,* No. 15-CV-02392-WHO, 2015 U.S. Dist. LEXIS 108223, *15 (N.D. Cal. Aug. 17, 2015) ("Courts routinely exercise their discretion to invalidate or refuse to enforce

7

Exhibit 1 Page 10

arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights"); *see also Uber I*, 2013 WL 6407583 at \*4-5. McKee filed a putative class action against Audible based on its member policies, including its credit redemption, credit rollover, automatic renewal, and cancellation policies on March 10, 2018. *See* generally Docket No. 1. After several rounds of briefing, the Court denied Audible's Motion to Compel Arbitration on July 17, 2018, because it found that Audible's Original Mobile Sign Up Flow and Audible's Original Mobile Credit Redemption Flow did not require customers to agree to Audible's COU and the arbitration provision therein. *See* Ruling I at 13-15. This arbitration provision has contained a class action waiver since September 6, 2012. *See* Docket No. 18-5 at page 4 (Audible COU on June 26, 2016); *see also* Declaration of Jason Massello In Support of Audible's Opposition to Plaintiffs' Motion for Corrective Action ("Massello Decl."), Docket No. 78-1 at ¶ 2. Thereafter, Audible made changes to the Flows.[7] *See* Soderstrom Decl. ¶¶ 5-9. Two days following the Court's Ruling I, Audible also made changes to its arbitration agreement, removing one year statute of limitations requirement contained therein and including a more conspicuous hyperlink to Amazon.com's Conditions of Use. *See id.* ¶ 2.

Second, Audible's actions, *i.e.* the changes it made to the Flows, effectively asked putative class members to waive their ability to participate in this, or any class action, in exchange for continued use and enjoyment of their Audible Membership, and did so without providing notice of the present action or affording opt out rights. Several courts have found that a lack of notice of the present suit may render such communications misleading. *See, e.g.*, *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1197 (11th Cir. 1985) (defendant bank conducted telephone campaign "shrouded" in "secrecy and haste" with explicit purpose of soliciting opt-outs from bank customers); *Friedman*, 730 F.Supp.2d at 764 (defendant obtained settlement releases without informing class members they were giving up the right to participate in putative class action); *In re Currency Conversion Fee*, 361 F.Supp.2d at 251 (defendant did not inform class members of pending class action).

Audible's changes to the Flows had this effect because the changes "fixed" the

---

[7] Audible does not deny that the Flows changed following the Court's order. *See generally* Massello Decl. ¶ 5. Audible claims that, as "part of its regular business [it] frequently revise[s] and seek[s] to improve various visual aspects of the webpages on which assent occurs." *Id.* Audible is silent on whether it made these changes in order to ensure that it provides sufficient notice. Audible also claims that it first implements such changes via "test groups." *Id.* The result, according to Audible, is that even on the same day, two users using the same devise might view different versions of a given flow. *Id.* ¶ 6.

Exhibit 1 Page 11

deficiencies noted by the Court in Ruling I. For example, the new flows no longer have the linguistic imprecision that plagued the Original Sign Up and Credit Redemption Flows. *See* Pl.'s Mot. at 4-6 (displaying side by side comparisons). The new flows also placed the disclosures directly below the credit redemption buttons. *See id.* Taken together, the changes were plainly directed at, and were ultimately successful, in ensuring Audible provided then current and would-be members with sufficient notice of the arbitration provision contained in COU. *See* Ruling I at 13-15 (discussing deficiencies in Audible's original flows); *see also*, *id.* at 17-18 n.7 (holding that Amazon's checkout page afforded sufficient notice). Thus, in implementing changes to its web design, Audible actively sought a waiver of certain of its then members' class action rights as a term of Audible membership *for the first time*. In other words, Audible asked putative class members to give up their ability to participate in the pending action (or any class action for that matter) in exchange for continued use of the Audible service. In seeking such an agreement, Audible afforded no notice of the pending action to its then current members, nor did it provide its members with the opportunity to opt out.

Finally, Audible's communications were coercive in a different way: because Audible requires members to agree to its then current COU in order to redeem a credit, then current members who did not want to agree to waive class action rights would be forced to forfeit whatever credits they had. This choice was inherently coercive because it forced Audible members to give up a paid-for benefit and end an ongoing business relationship in order to refuse to waive their class action rights. *See Kleiner*, 751 F.3d at 1202 ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." (internal quotations omitted); *see also Doe v. Swift Transp. Co.*, No. 2:10-cv-00899 JWS, 2017 U.S. Dist. LEXIS 26507, *15 (D. Ariz. Feb. 24, 2017) ("The threat of owing money undoubtedly has a chilling effect on participation in the class action . . . ."); *In re Currency Conversion Fee*, 361 F.Supp.2d at 251 ("[T]he potential class consisted of cardholders who depend on defendants for their credit needs . . . . Thus, in light of the cardholders' dependence on defendants for their future credit needs and information, this Court finds that Chase's and Citibank's actions are potentially coercive and improper.").

In sum, Audible's actions with regard to the Flows were: (1) unilateral, (2) directed at putative class members following the initiation of the lawsuit and subsequent denial of Audible's motion to compel, (3) did not include notice of the current action, and (4) forced putative class

Exhibit 1 Page **12**

members to waive their rights or give up benefits. For these reasons, Audible's actions constitute coercive and misleading communications that have interfered (and could continue to interfere) with the present litigation. As such, Plaintiff is entitled to the narrow relief under Fed. R. Civ. Proc. 23(d) described below.

Defendant's arguments otherwise are unpersuasive. As an initial matter, Defendant's opposition brief essentially concedes it changed the Flows following the Court's ruling on the first motion to compel in an effort to fix the deficiencies therein. *See* Opp'n at 13 (describing Audible's conduct as "clarifying the disclosures on its website"). Defendant also does not dispute that the updated disclosures require Audible members to agree to arbitration each time they redeem a credit. In fact, Defendant moved to compel Plaintiffs Weber and Rogawski to arbitration, at least in part, based on their use of Audible after the modified disclosures. *See* Opp'n at 9 (conceding that the invalidation of post-litigation assent procured through altered Flows could determine whether Weber should be forced to arbitrate); *see generally* MTC. Audible also wholly fails to address the predicament a then-current Audible member faced when presented with the updated disclosures: agree or forfeit something of value.

Further, Defendant argues that Plaintiff's motion is premature because the class has yet to be certified and may never be. *See* Opp'n at 6:23-10:2. However, as the Court notes above, its Rule 23(d) powers may be exercised before class certification. *See supra* at 7 (citing cases); *see also*, *Friedman*, 730 F.Supp.2d at 765 ("[T]he effect of a defendant attempting to influence potential plaintiffs not to join an embryonic class action would be just as damaging to the purposes of Rule 23 as a defendant that influences members of an already-certified class."); *see also Menzies*, *Aviation Inc.*, 2015 U.S. Dist. LEXIS 108223, at *15-16 (listing cases). Indeed, Defendant admits Rule 23(d) provides the Court with this authority. *See* Opp'n at 8. Furthermore, as discussed in more detail below, the Court would severally limit the relief Plaintiff requested, and do so with an eye toward providing relief that will hasten, as oppose to hinder this litigation as it moves toward Plaintiffs' motion for class certification. Moreover, as Defendant concedes, the corrective action requested may be immediately relevant to Plaintiff Weber's ability to participate in this litigation. *See id.* at 9:12-26. As Defendant also points out in its briefing, Weber may be the only named Plaintiff with standing to assert certain of Plaintiffs' claims. *See id.*

Further, while the Court has expressed initial doubts about Plaintiffs' ability to

**Exhibit 1 Page 13**

successfully certify a nationwide consumer class, such doubts are commonplace in the modern class action landscape. More importantly, the pending motion is not the appropriate time to argue the merits of the class. Thus, Defendant's arguments concerning the viability of certification are not reasons to deny the pending motion.

Defendant also argues that the actions it took were not coercive and misleading. *See id.* at 14:1-17:20. Defendant attempts to distinguish this case from the inherently coercive employment relationship found in many of the illustrative cases. While the settings are certainly different, the online marketplace has its own inherent coercive qualities. The present case provides such an example, where a company can freeze a customer out of using its product − *an already paid for product* − unless the consumer accepts new terms and conditions. Also, *In Re Currency Conversion*, although not an internet case, makes the same point in a similar one-sided business relationship between a bank and an individual client. *See* 361 F.Supp.2d at 251. *Uber I* and *Uber II* also discuss the coercive potential of post lawsuit agreements to arbitrate that can be easily accepted ("just swipe left to agree"), but are more onerous to reject. Here, current Audible members were given no realistic way to refuse the terms offered by the new disclosures without ending their business relationship with Audible and/or losing paid for benefits. There were no opt outs permitted at all, which makes the communications even more coercive than those in *Uber I*, *Uber II*, and *In Re Currency Conversion*.

Defendant's attempts to limit the persuasive value of *In Re Currency Conversion* are not compelling. *See* Opp'n at 16:13-17:1. The Court does not agree that *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, (2011), altered a court's power under Rule 23(d) irrespective of that case's "landmark" status. *See* Uber I, 2013 WL6407583 at *3 (rejecting similar argument that Rule 23(d) interferes with the FAA). Additionally, while *In Re Currency Conversion* did involve an already certified class, Defendant fails to explain why that would make a difference in terms of the coercive nature of the communications. Defendant also claims that Audible has always required arbitration. However, as explained above, prior to the changes, Audible did not require certain members, *i.e.* those for whom McKee's experience was representative, to agree to any such thing until they became potential members of the class McKee proposes. *See supra* at 8-9.

Third, Defendant argues that the revised disclosures are not misleading because they make Audible's terms more, not less clear. *See* Opp'n at 17:21-20:9. The problem with this

**Exhibit 1 Page 14**

argument is that it misconstrues the nature of Audible's communications. The revised websites offered a take it or leave it class arbitration waiver, for the first time, and did so without disclosing the presence of this pending class action, a case that admittedly prompted the revisions.

Finally, Defendant argues that because arbitration provisions may be retroactive, its actions cannot be considered coercive. This argument is unavailing for a few reasons. First of all, it ignores the fact that the agreement is being solicited during, and in apparent response to a pending class action. Second, the agreement being offered could not be refused without sacrificing something of value. Third, the Court's power to invalidate these agreements is based in Rule 23(d), not state unconscionability law. In other words, under Rule 23(d) a court may prohibit a party from doing what it could otherwise do legally were no case pending, within reason. *See Gulf Oil*, 452 U.S. at 101.

Based on the above, the Court would find that Audible's changes to its Flows were coercive and misleading attempts to interfere with putative class members' ability to participate in the current litigation. The Court would therefore find any agreement to arbitrate entered into by a *then current* Audible member, on or after the Court denied the MTC through the present null and void only to the extent that it would limit a class member's participation or recovery in this action. Audible will be permitted, but not required, to obtain consent to its current arbitration provision from such members provided it does so in a manner that discloses information about this suit and affords an opt-out.[8]

The Court notes that this relief is limited in nature to what Plaintiff requests. *See* Docket No. Docket No. 71-15 at 2. The Court would take no action with respect to putative class members who were not Audible members prior to the Court's denial of the MTC[9]; (2) the Court would not require Audible to place any information on its public facing websites; and (3) if

---

[8] Audible's problem herein is its unilateral and unauthorized attempt at self-helping its litigation position at the expense of actual and potential class members. The Court would caution it (as the Court would advise any party in a litigation) to seek the Court's approval before engaging in a such conduct which would have a direct and immediate impact on the litigation, especially when the conduct is opposed by the opposing party.

[9] This is because such members were not required to sacrifice anything of value in order to refuse the terms and conditions offered. Furthermore, such members were not potential members of the class at sign up, which is when their agreement was obtained. To do otherwise would essentially require every business to disclose its litigation activities at its first interaction with a customer in order to obtain consent to a class action waiver. The Supreme Court cautions against such overly broad relief. *See Gulf Oil*, 452 U.S. at 101.

**Exhibit 1 Page 15**

Audible provides new agreements, with proper notice of the current action and opt out opportunities, the Court would take no action with respect to such agreements.[10]  In other words, Audible members in McKee's position could be subject to arbitration agreements if they give their informed consent and do not opt out.  Court finds that these limitations reflect its careful weighing of the need for relief with the respective rights of the parties.  *See Gulf Oil*, 452 U.S. at 101-102.  Audible and its customers may continue to agree to arbitrate disputes, *even this one*, provided the agreement is informed in a manner that will avoid interference with the present litigation.  At the same time, the relief proposed remedies Audible's ability to use coercion and/or incomplete information to shrink the size of Plaintiff's potential class.

The Court would ask the Plaintiff to prepare a more limited proposed order consistent with the Court's opinion.  Additionally, the Court would direct Audible to meet and confer with Plaintiff's counsel regarding notice in the event Audible wishes to obtain class action waivers from putative class members in this action.

### D.  Conclusion

The Court would GRANT-in-part and DENY-in-part Plaintiff's Motion for Corrective Action.

## IV.  Defendants' Motion to Compel Arbitration

### A.  Background

Defendant moves to compel Plaintiffs Weber and Rogawski to arbitrate their claims pursuant to the Audible COU.  *See generally* MTC at 1.  Defendant contends that Rogawski agreed to Audible's COU, and the arbitration provision therein on September 30, 2015, when he redeemed a credit through the Amazon.com website.  *See* Declaration of Aniket Gune in Support of Audible's MTC ("Gune Decl."), Docket No. 73-1 at ¶¶ 11-12.  Defendant argues that the Credit Redemption Flow that Weber and Rogawski viewed on these occasions afforded the type of notice that this Court already found sufficient when it compelled Plaintiff Beals to arbitrate his non-gift membership claims against Audible.  *See* MTC at 2; Ruling II (finding that Beals' credit redemption constituted noticed assent to Audible's COU).

Plaintiffs oppose the motion with respect to Rogawski on evidentiary grounds and by reference to their Motion for Corrective Action.  *See* Pl.'s Opp'n at 1:19-3:9.  Plaintiffs initially

---

[10] Such notice and opt out rights must also disclose and seek to remedy the potential forfeiture required for customers wishing to opt out.  The Court will leave it to the parties to work out the specifics of that arrangement.

**Exhibit 1 Page 16**

opposed the motion with respect to Weber on the grounds that Audible presented evidence related to "the wrong Eric Weber." *See id.* at 1:6-18. However, in Plaintiffs' Sur-Reply they oppose the motion on the additional basis that, the evidence Audible subsequently presented regarding the correct Eric Weber only demonstrates, at most, that he agreed to arbitrate claims against Amazon, as opposed to Audible. *See* Sur-Reply at 1-5.

### B. Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the Act is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F.Supp.2d 538, 540 (E.D. Pa. 2006)).

On a Motion to Compel Arbitration, the Court applies a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure. *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)). Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be

admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotation marks omitted).

Similarly, at the summary judgment stage the Court does not "focus on the admissibility of the evidence's form," but rather "focus[es] on the admissibility of its contents." *Fraser*, 342 F.3d at 1036. Objections on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate. *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they are capable of being reduced to admissible evidence at trial."); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if declaration violated best evidence rule, court was not precluded from considering declaration in awarding summary judgment).

### C. Analysis

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As the party moving to compel arbitration, Defendant bears the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F.Supp.2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009)).

Under Washington law, in order to form a valid contract the parties must manifest their mutual assent.[11] *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash.2d 171, 177-78 (2004); *see also Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007).[12] In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of a

---

[11] This Court previously: (1) noted "that the Amazon COU incorporated by reference in the Audible COU contains a choice of law provision that provides for the application of the laws of the state of Washington;" and (2) conducted a choice of law analysis and concluded that it "would, in keeping with California choice of law principles, honor the parties' choice of law provision and apply Washington law." *See* Docket No. 35 at pages 7-8 of 24.

[12] The relevant California law is functionally identical. *See Bowman v. Victor*, 83 Cal.App.2d 693 (1948); *Roth v. Malson*, 67 Cal.App.4th 552, 557 (1998).

**Exhibit 1 Page 18**

merchant's terms of service agreement. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein."). Reasonable notice in this context requires that the consumer had either actual or constructive notice of the terms of service; constructive notice occurs when the consumer has inquiry notice of the terms of service, like a hyperlinked alert, and takes an affirmative action to demonstrate assent to them. *See id*. at 1176-79. This "inquiry turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177.

Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of service. *See, e.g.*, *Riensche v. Cingular Wireless, LLC*, C06-1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v. Google*, Civil Action No. 06-2540, 2007 WL 966011, at *5-8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract). Courts have also found constructive notice where sites contain a disclosure statement that indicates that if a user signs up for a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See, e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign Up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them"). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[13]

---

[13] *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:

Exhibit 1 Page 19

Alternatively, some courts have refused to enforce sign-in-wrap, or click-wrap agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice. *See, e.g.*, *Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Sprecht v. Netscape Communications Corp.* 306 F.3d 17, 22-23 (2d. Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign up process); *Meyer v. Kalanick*, 199 F.Supp.3d 752, 763 (S.D.N.Y. 2016) (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement").

While courts addressing constructive notice in internet commerce have avoided establishing hard and fast rules, review of the case law at the district level provides important guidance. *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).
>
> Second "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through

---

Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

97 F.Supp.3d at 394-95.

**Exhibit 1 Page 20**

hyperlinkage. *See, e.g., Ticketmaster Corp.*, 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the 'terms of use' 'could not be missed'); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).

Third, 'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen – an action that was not required to effectuate her purchase").

97 F.Supp.3d at 401-02.

It was with this guidance in mind, and after a review of several, but admittedly not all of the sign-in-wrap agreements examined by courts throughout the country, the Court examined the particular design of the Sign Up Flow and Credit Flow to determine if Audible provided constructive notice of the Audible COU to Plaintiff Beals. *See* Ruling II. After doing so, it concluded that the Audible Credit Redemption Flow as accessed on Amazon.com provided him sufficient notice. *See id.* at 13-15. The Court did the same with respect to McKee and determined that the Audible's flows he interacted with did not afford sufficient notice. *See* Ruling I at 19.

           1. <u>Rogawski's September 30, 2015 Credit Redemption on Amazon.com</u>

Defendant contends that Rogawski agreed to Audible's COU, and the arbitration provision therein on September 30, 2015, when he redeemed a credit through the Amazon.com website. *See* MTC at 4-6; *see also,* Declaration of Aniket Gune in Support of Audible's MTC ("Gune Decl."), Docket No. 73-1 at ¶¶ 11-12. Defendant argues that the process by which

**Exhibit 1 Page 21**

Rogawski redeemed this credit required was identical to the one Plaintiff Beals completed and that the Court already held provides sufficient notice. *See* MTC at 2; Ruling II at 13-15 (finding that Beals' May 27, 2017 credit redemption on Amazon.com bound him to Audible's COU).

Plaintiffs initially argued that Audible's evidence was insufficient to establish that Rogawski viewed the same flow as Beals when he redeemed a credit on September 30, 2015. *See* Opp'n at 2-3. However, following a subsequent meet and confer, Plaintiffs appear to be willing to concede as much, provided Audible makes a further evidentiary showing. *See* Sur-Reply at 13:7-14:27. Specifically, Audible's motion to compel relies on testimony that, in turn, relies on yet to be produced business records. *See* Gune Decl. ¶¶ 11-12. At the last hearing, the Court told Defense counsel that it was to provide copies of those records to Plaintiffs. *See* Tr. at 19-21. At the time Plaintiffs filed their Sur-Reply, Audible had yet to provide that documentation. *See* Sur-Reply at 14.

The Court would find that Rogawski agreed to Audible's COU on September 30, 2015, subject to the parties' ability to resolve the aforementioned issue. Should the issue remain unresolved due to Audible's failure to provide documentation, the Court would consider whether an evidentiary hearing, or limited arbitration related discovery would be required.

On September 30, 2015, Rogawski (at least according to Audible's declaration testimony) redeemed a membership credit on the Amazon desktop website. Gune Decl. ¶ 12, Ex. 2. In order to do so, Rogawski selected an audiobook, and then encountered the then in use flow ("Amazon Redemption Flow"). *See* Gune Decl. ¶ 12; *see also*, *id.* Gune Decl. Ex. 2 (Amazon Redemption Flow). This was the same flow that Plaintiff Beals encountered, and that this Court has already found provided sufficient notice under the relevant case law. *See* Gune Decl. ¶¶ 14-15; *see also*, Ruling II at 13-15.

Thus, the Court would find that the Amazon Credit Flow, as it is reflected in exhibit 2, afforded constructive notice that redeeming a credit for an audiobook constituted assent to the Audible COU and the arbitration provision contained therein. However, as stated above, if Audible fails to provide the documentation relied on by Gune, this ruling might be deferred pending discovery.

The Court would also find, as it has previously, that the arbitration provision was not unconscionable or otherwise unenforceable. *See* Ruling I at 18-21, Ruling II at 15; *see also*, *Ekin*, 84 F.Supp.3d at 78; *Fagerstrom*, 141 F.Supp.3d at 1064-76; *Peters*, 2 F.Supp.3d at 1170.

**Exhibit 1 Page 22**

As a result, the Court would GRANT Audible's motion to compel Rogawski's claims to arbitration, subject to resolution of the evidentiary issues subject to the meet and confer.[14]

### 2. Weber's Use of Amazon

In Defendant's initial moving papers, it identified three instances in which Weber redeemed a credit on Audible's mobile web platform ("Audible Mobile Credit Flow"). *See* MTC at 10:20-11:1. However, the evidence attached concerned another Eric Weber, who is not the named Plaintiff in this action. *See* Ruling III at 33.

In its Reply, Audible submits zero evidence that the "real Eric Weber" agreed to Audible's COU. *See generally* Declaration of Karen Ressmeyer in Support of Reply Brief on Audible's Motion to Compel, ("Ressmeyer Decl."), Docket No. 82-4. Instead, Audible provides evidence that Weber agreed to Amazon's COU by signing up for Amazon, Amazon Prime, and making several purchases on Amazon.com and/or Amazon Prime. *See* Ressmeyer Decl. at ¶¶ 6-9. Audible argues that in agreeing to Amazon's COU, Weber agreed to arbitrate claims *against Audible*. *See* Def.'s Reply at 12:5-15:16. The Court already rejected this argument and does so again. *See* Ruling I at 17.[15] Amazon's COU do not reference Audible, or state that Audible is a

---

[14] Consistent with the Court's attached ruling on Plaintiff's Motion for Correction Action, the Court would not have found assent solely based on Rogawski's October 18, 2017 credit redemption on Audible.com. *See supra* at 13. However, because Rogawski assented to the Audible COU back in 2015, the relief afforded by the Court would have no effect on Rogawski, or any other Audible member that had already agreed to the Audible COU before the commencement of this litigation. *See id.*

[15] In relevant part, the Court held as follows:

> Defendants' final attempt to bind Plaintiff to the arbitration clause contained in Audible's COU is to argue that he pre-agreed to arbitrate claims against Audible each and every time he purchased a product from Amazon. This is because, Defendants contend, Amazon's COU cover all of Amazon's affiliates and their products. *See* Defs.' Supp. Br. at 10:11-23. It appears to be undisputed Plaintiff has made multiple purchases on Amazon and that, each time he assented to Amazon's COU. *See* Massello Supp. Decl. at ¶¶ 36-37, Exs. 18-19. Defendants argue that because Amazon's COU define "Amazon" to include its affiliates, Plaintiff, in making purchases on Amazon.com enters into arbitration agreements with every single Amazon affiliate. This line of argument is unpersuasive. First, it is a relatively basic proposition that a party can only assent to a contract with notice of its essential terms, including, the actual parties to the contract. *See Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) ("Washington law requires that the 'essential elements' of the contract be set forth in writing. An essential element is identification of the parties to the contract."). Audible is not listed as a party to the Amazon COU.

> Further, Defendants contention that the Amazon sign in page provided Plaintiff with notice that he was making an agreement *with Audible* has other problems. For one, unless the Amazon agreement directs Plaintiff to Audible's

**Exhibit 1 Page 23**

party to Amazon's COU. *See* Ressmeyer Decl. Ex. 6. As such, the Amazon COU's do not bind Weber to arbitrate claims *against Audible*. *See* Ruling I at 13. The Court already rejected an estoppel based argument raised previously whereby Audible, as a non-party, could seek to enforce the Amazon COU. *Id.*

Audible's only attempt to distinguish the case of Weber, from the case of McKee, whom the Court held did not agree to arbitration with Audible simply by agreeing to arbitrate with Amazon, is to argue that the nature of Weber's claims are different because they rely on an alleged misuse of a credit card Weber provided in connection with his Amazon account. Audible contends that because Weber's claims would fall within the scope his agreement to arbitrate with Amazon, he must also arbitrate claims against Audible. Audible again misses the point. Weber's present claim is against Audible. Audible has not produced evidence that Weber ever agreed *with Audible* to arbitrate disputes between Weber *and Audible*. It may be the case that Weber has agreed to arbitrate claims like the ones asserted here were he to assert them against Amazon. However, that determination would only allow Amazon to force Weber into arbitration; it would not allow Audible to do the same. *See* Ruling I at 17.

In sum, Audible has failed to demonstrate that is has evidence that would show that Weber agreed to arbitrate his present claims.

### E. Conclusion

The Court would GRANT Audible's motion to compel Rogawski to arbitration, if the evidentiary issues (*see*, *supra*, at 19-20) are resolved; but DENY Audible's motion to compel Weber to arbitration.[16]

---

> COU in some way, or notifies Plaintiff of the existence of Audible as an Amazon affiliate it does not afford notice. The Court is unwilling to hold that a reasonable consumer signing into Amazon would believe he or she is also waiving the right to sue several additional corporations. While Amazon may be able to compel Plaintiff to arbitrate his claims based on purchases he made on Amazon, Audible may not.

Ruling I at 17.

[16] As discussed above, the parties are continuing to meet and confer on certain evidentiary issues. Plaintiff's counsel has indicated that he will stipulate to the fact that Rogawski viewed the same credit redemption flows as Beels, provided Audible produces the documents that Gune relies on. *See* Declaration of Jamin S. Soderstrom in Support of Plaintiffs' Sur-Reply ("Soderstrom Supp. Decl."), Docket No. 90-3 at ¶ 8. However, Plaintiffs have also reserved the right to argue otherwise if Defendant fails to produce said evidence, or produces evidence that casts doubt on the accuracy of the declaration testimony. *Id.* The Court may defer finalizing its decision to grant Audible's motion with respect to Rogawski until this issue is resolved.

**Exhibit 1 Page 24**

## IV. __Conclusion__

      The Court would GRANT-in-part and DENY-in-part Plaintiffs' Motion for Corrective Action. The Court would GRANT Audible's Motion to Compel Arbitration as to Plaintiff Ragowski (subject to the evidentiary issues) but DENY Audible's MTC as to Plaintiff Weber.

__Exhibit 1 Page 25__